UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

COMLAB, CORP.,

                      Plaintiff,

         -v-

KAL TIRE and KAL TIRE MINING TIRE
GROUP,

                 Defendants.

------------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 11, 2018

17-cv-1907 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

On March 15, 2017, plaintiff ComLab, Corp. ("ComLab") commenced this breach of contract action against defendants Kal Tire and Kal Tire Mining Tire Group (collectively, "defendants" or "Kal Tire"). (See Compl., ECF No. 1.) Currently before the Court is Kal Tire's motion for spoliation sanctions. (ECF No. 59.) Kal Tire alleges that ComLab fabricated, for litigation purposes, certain e-mails concerning payment due under the contract at issue. (Id.) ComLab denies that accusation, but also concedes that it cannot produce so-called "native" versions of the contested e-mails because of an alleged virus that affected ComLab President Matteo Deninno's computer, resulting in his wiping or erasing its contents. (ECF No. 61.)

The Court held an evidentiary hearing to resolve certain factual disputes relating to Kal Tire's motion. For the reasons set forth below, the Court concludes that Kal Tire has proven that ComLab fabricated and spoliated evidence, that these

acts were egregious, intentional and outrageous, and therefore GRANTS the motion for terminating sanctions.

I.      BACKGROUND

What follows is a brief recitation of the facts most relevant to resolution of the pending motion.  The facts are undisputed unless otherwise noted.

A.      Underlying Action

At its core, this is a relatively uncomplicated breach of contract action between ComLab, a New York information technology corporation, and Kal Tire, a Canadian tire partnership based in Vernon, British Columbia.  The two individuals central to this dispute are Matteo Deninno ("Deninno"), ComLab's President, and Alex Vitale ("Vitale"), the former Vice President of Sales and Marketing at Kal Tire.

ComLab alleges that in August 2015, it executed a contract to provide twenty-four months of services for Kal Tire's "MyMTG" intranet in exchange for a monthly fee of $20,000.  It is undisputed that ComLab sent (and Kal Tire received) four invoices pursuant to that alleged agreement.  It is further undisputed Kal Tire's former Vice President of Sales and Marketing Alex Vitale ("Vitale") caused three of those invoices to be paid.  Kal Tire, however, has argued that: (1) it never executed any agreement with ComLab; (2) it never received any of the services ComLab claims to have provided for MyMTG; (3) it never approved payment of any invoices; and (4) there has been no breach.

B.    Allegations of Fabrication and Spoliation

As previously noted, it is undisputed that Kal Tire received four invoices pursuant to the alleged agreement.  Currently at issue are sixteen additional invoices (for the period of December 2015 through March 2017) that ComLab produced during discovery (the "Contested Invoices").  These Contested Invoices would constitute highly relevant evidence of the existence of a contract between ComLab and Kal Tire—the very basis of ComLab's claims in this case.  Kal Tire, however, asserts that it never received the Contested Invoices and hotly disputes their authenticity.  For these reasons, these Contested Invoices are central to the parties' claims and defenses in this case.    After the Contested Invoices were produced during discovery, on November 13, 2017, Kal Tire requested documents "sufficient to identify the date(s) when ComLab sent" each of the Contested Invoices, as well as a copy of the letters/e-mails of transmittal.  (See Defs.' Ltr. Dated May 5, 2018 ("Defs.' Sanctions Ltr.") Ex. A at 13, ECF No. 59-1 (emphasis in original).)  The "General Instructions" section of the document request included an instruction to "[p]roduce all [electronically stored information] in single-page .TIFF format, with native files, accompanying text files, and load files."  (Id. at 2.) ComLab responded to that request by producing thirteen hard copy e-mails that it alleges to have sent between December 2015 and October 2016 (the "Subject E-mails").  The Subject E-mails include:

- Four e-mails allegedly sent by Deninno to Caitlin Brothen ("Brothen") between December 2015 and March 2016, each one attaching a monthly invoice;

- Seven e-mails allegedly sent by Deninno to Brothen between April 2016 and October 2016, each one attaching a monthly invoice; and

- Two e-mails allegedly sent by Deninno to Brothen in September and October 2016 requesting payment on outstanding invoices.

(See Decl. of Allan Heel ("Heel Decl."), ECF No. 59-7.)

In connection with its motion for sanctions, Kal Tire submitted a declaration from Allan Heel ("Heel")[1], who serves as Kal Tire's Director of Platform and Productivity Technology Information Services. (See id.) Heel asserts that in November 3, 2015, Kal Tire enabled the "Litigation Hold" feature for Vitale and Brothen's e-mail accounts, which "preserves every email that is sent to or from those accounts."[2] (Id. ¶¶ 2-3.) After receiving the Subject E-mails during discovery, Kal Tire searched Vitale and Brothen's e-mail accounts to verify whether the Subject E-mails (which were purportedly sent after the litigation hold was enabled) were in fact received. (Id. ¶ 4.) Kal Tire was unable to locate the Subject E-mails on the server. (Id.)

---

[1] As discussed more fully below, Heel also testified in person during the evidentiary hearing on July 18, 2018.
[2] The "Litigation Hold" feature does not appear to have been enabled for purposes of this action, which was not filed until March 15, 2017, more than a year and a half later. That fact is irrelevant for purposes of this Opinion & Order—the relevant fact is that the hold was put in place.

After it was unable to locate the Subject E-mails on the server, Kal Tire made multiple written requests for the underline versions of the Subject E-mails. (See, e.g., Defs.' Sanctions Ltr. Ex. B and C, ECF Nos. 59-2 and 59-3.) It is Kal Tire's belief that metadata contained in the native versions would allow it to analyze the authenticity of the Subject E-mails by verifying the dates they were created and sent. Notably, Kal Tire's request for native e-mails was consistent with their original document request dated November 13, 2017, which requested "all [electronically stored information] in single-page .TIFF format, with native files, accompanying text files, and load files." (Defs.' Sanctions Ltr. Ex. A at 2.)

Initially, ComLab agreed to produce the electronically stored information as requested. (See Defs.' Sanctions Ltr. Ex. D, ECF No. 59-4.) However, on April 16, 2018, two days before Deninno's deposition was scheduled to take place, ComLab informed Kal Tire that it would not be able to produce native versions of the Subject E-mails because Deninno "had to wipe the machine on which the native emails existed" due to a computer virus. (Defs.' Sanctions Ltr. Ex. E, ECF No. 59-5.) ComLab has since explained that Deninno cleared his database because his computer "was infected with a harmful virus that had the potential to compromise software which [ComLab] relies upon to run its business." (See Pl.'s Ltr. Dated May 11, 2018 ("Pl.'s Sanctions Response") at 2, ECF No. 61.) ComLab further asserts that Deninno believed he had adequately preserved all e-mails related to this action by saving them in .PDF format. (Id.)

Based on its inability to independently verify the existence of the Subject E-mails and ComLab's inability to produce native versions, Kal Tire alleges that Deninno fabricated the Subject E-mails and subsequently wiped his computer to hide that fact. ComLab denies that accusation, and argues that Kal Tire is jumping to unsupported conclusions.

C.    <u>Procedural History</u>

On May 2, 2018, Kal Tire moved for spoliation sanctions against ComLab. (<u>See</u> Defs.' Sanctions Ltr.) Kal Tire argues, in sum, that Deninno fabricated the Subject E-mails for litigation purposes and subsequently deleted the native versions to hide that fact. (<u>See generally</u> <u>id.</u>) As a result, Kal Tire argues that the case should be dismissed with prejudice, and that ComLab should be ordered to reimburse Kal Tire for its attorney's fees and costs. (<u>Id.</u>)

On May 11, 2018, ComLab opposed Kal Tire's motion for sanctions. (<u>See</u> Pl.'s Sanctions Response.) ComLab argues that there is an innocent explanation for Deninno's decision to delete his e-mail database, and that Kal Tire has failed to produce any concrete evidence that the Subject E-mails were fabricated. (<u>See</u> <u>generally</u> <u>id.</u>) ComLab also submitted evidence tending to suggest that the invoices attached to the Subject E-mails were created on or about the date indicated on the invoice. (<u>See</u> Pl.'s Sanctions Response Ex. E, ECF No. 61-5.) Kal Tire replied on May 18, 2018. (<u>See</u> Defs.' Ltr. Dated May 18, 2018 ("Defs.' Sanctions Reply," ECF No. 64.) On May 22, 2018, the Court scheduled an evidentiary hearing for July 18, 2018 to resolve disputed issues of fact. (ECF No. 66.)

Subsequent to the Court's Order scheduling an evidentiary hearing, the following submissions have been made:

- On June 1, 2018, ComLab submitted a response to Kal Tire's May 18, 2018 reply. (See Pl.'s Ltr. Dated June 1, 2018 ("Pl.'s Sanctions Sur-Reply"), ECF No. 68.)

- On July 17, 2018 the Court received, in hard copy, a binder of exhibits from Kal Tire dated July 16, 2018. The binder included certain exhibits which had not previously been filed on the public docket.

- On the morning of the evidentiary hearing, the Court received two additional exhibits from Kal Tire which had not been filed on the public docket.

- On July 18, 2018, after the evidentiary hearing took place, Kal Tire filed a declaration by Caitlin Brothen. (See Brothen Decl., ECF No. 72.)

- On July 19, 2018, Kal Tire filed a letter containing an excerpt of a deposition of Alex Vitale, as well as a thumb drive containing a video shown during the evidentiary hearing. (ECF No. 73.)

- On July 19, 2018, the parties filed a joint letter in response to the Court's questioning during the evidentiary hearing regarding the appropriate burden of proof to be applied. (ECF No. 74.) The joint letter further made clear that "the parties do not object to any of the exhibits offered into evidence at [the] evidentiary hearing." (Id.)

- On July 19, 2018, counsel for ComLab filed a letter indicating that he was unable to submit a copy of the final receipt for the computer Deninno allegedly purchased in December 2017. (ECF No. 75.)

All of the aforementioned filings are considered as part of the record for purposes of this Opinion & Order.

D.    The Evidentiary Hearing

The Court held an evidentiary hearing to resolve certain factual disputes related to Kal Tire's motion on July 18, 2018. During that hearing, defendants offered two live witnesses: Allan Heel and Joseph Caruso. Plaintiffs offered only one witness: Matteo Deninno.

What follows is a brief summary of the relevant testimony offered by each witness, as well as the Court's findings as to the credibility of each.

1.    Heel

As previously noted, Heel serves as Kal Tire's Director of Platform and Productivity Technology Information Services. Heel was extremely professional, well-prepared, and educated in the field of computer technology. As discussed in more detail below, Heel's testimony points the Court to two key findings. First, he testified that no work was performed in connection with the Contested Invoices, (Tr. at 30:18.), which is circumstantial evidence that they were never issued. And second, he testified that the Contested Invoices were never received by Kal Tire, (Tr. at 32:18-22.), which again leads the Court to believe that they were never sent

at all.  The Court found Heel to be highly credible, and gives great weight to his testimony in resolving the current motion.

Heel has worked at Kal Tire for almost twelve years, and currently supervises a team of twenty-three technicians responsible for supporting Kal Tire's technology infrastructure.  (See Tr. of Evidentiary Hr'g ("Tr.") at 28:20-25.)  Heel has worked in the field of computer technology for twenty-five years, and has obtained a number of certifications in various technical areas.  (Tr. at 29:1-8.)

Kal Tire's intranet is called "MyMTG."  (Tr. at 29:15-18.)  Heel and his team are responsible for maintaining the MyMTG servers and providing day-to-day operations, including making updates and upgrades.  (Tr. at 29:19-30:2.)  As a result, Heel has personal access to: (1) an internal "change management system" which logs all changes to MyMTG; and (2) all application and server logs that MyMTG resides on.  (Tr. at 30:3-9.)

In connection with this litigation, Heel performed an investigation into ComLab's claim that it provided services for MyMTG.  (Tr. at 30:20-25.)  Specifically, Heel searched the change management system and interviewed all of the key technical stakeholders who would have been involved in any updates or upgrades to MyMTG.  (Id.)  Based on that investigation, Heel concluded that ComLab never made any changes or upgrades to the MyMTG intranet as it claims.  (Tr. at 30:18.)  In response to questioning by the Court, Heel testified that he is typically informed of any services performed on the platforms he oversees, that he is not aware of any instances in which upgrades were made to the MyMTG platform

without his knowledge, and that there is no one at Kal Tire who has higher technical oversight over MyMTG than himself. (Tr. at 31:1-8, 31:23-32:2.)

In order to determine whether the Subject E-mails were in fact received by Kal Tire, Heel searched Vitale's and Brothen's e-mail accounts using the subject lines of the Subject E-mails. (Tr. at 36:14-25.) Crucially, Heel testified that it would have been impossible for Vitale or Brothen to permanently delete the e-mails from the server due to the litigation hold function which was activated in November 2015.[3] (Tr. at 37:3-10.) Heel was unable to locate <u>any</u> of the eleven Subject E-mails that attached an invoice, and only found <u>portions</u> of the other two Subject E-mails requesting payment. (Tr. at 32:18-22.)

Heel <u>was</u> able to locate other documents maintained by Brothen and Vitale during the relevant time periods. (Tr. at 37:25-38:12.) Importantly, Heel was able to locate the ComLab invoice e-mails that were concededly sent by Deninno and received by Kal Tire. (<u>See</u> Tr. at 38:14-39:19, 39:23-40:9.) Those e-mails included the same subject lines as the Subject E-mails. (Tr. at 39:20-22.)

2.     Caruso

Joseph Caruso ("Caruso") holds a B.S. in mathematics and engineering physics from Stevens Institute of Technology, and is a CISSP-certified information system security specialist. (Tr. at 54:7-17.) He currently serves as Chief Technology Officer of Global Digital Forensic ("Global"), a computer forensics firm.

---

[3] Heel further testified that his team has performed a test of the litigation hold function by deleting an e-mail from his own account (which has litigation hold activated), and then subsequently searching for it. The deleted e-mail was captured by the litigation hold. (Tr. at 37:17-24.)

(Tr. At 54:25-55:5.)  In that role, Caruso is responsible for, <u>inter alia</u>, maintaining the technology platforms that Global uses, training employees, and performing hands-on forensic work.  (Tr. at 55:9-13.)  Caruso has extensive experience in the field of computer forensics, and previously served as an adjunct professor at Yale, gave training seminars to multiple government agencies (including the CIA, FBI, and NYPD), and served on governmental cybersecurity boards under Presidents George W. Bush and Barack Obama.  (Tr. at 56:1-13.)

Kal Tire retained Caruso to review and analyze Deninno's claim regarding a computer virus, as well as to review and analyze certain metadata contained in e-mails and other documents.  (Tr. at 57:3-5.)  During the evidentiary hearing, the Court accepted Caruso as an expert in the fields of computer forensics and computer science; ComLab did not object to him being designated as such.  (Tr. at 56:14-19.)  The Court found Caruso's experience impressive and his testimony reasonable, logical, and ultimately highly credible.

In preparation for the evidentiary hearing, Caruso reviewed portions of Deninno's deposition testimony and affidavit relating to Deninno's computer virus claim.  (Tr. at 57:10.)  In Caruso's expert opinion, Deninno did not respond to the alleged Trojan virus in a way that an IT professional would be expected to.  (Tr. at 57:21-58:1.)  Specifically, Caruso testified that it would make no sense to delete <u>some</u> e-mails but not others, as Deninno claims to have done.  (Tr. at 59:24-60:15.)  Additionally, Caruso testified that Deninno uses an iMap connection through the GoDaddy server to receive e-mail on his phone.  (Tr. at 61:15-17.)  Caruso directed

Kal Tire to request access to Deninno's GoDaddy server to verify whether the Subject E-mails were in fact sent.  (Tr. at 61:23-62:2, 91:15-21.)  Deninno's counsel refused access.  (Tr. at 62:2-4.)

During the evidentiary hearing, Caruso testified that it is "easy" to manipulate metadata in a document, and showed a short video demonstrating a downloadable tool which allows the user to do just that.  (Tr. at 66:18-67:12.) Caruso subsequently testified that upon review of certain documents (including invoices) produced by ComLab, he determined that the metadata was likely manipulated since the "Last modified" date and time post-dated the "Date last saved" in several instances.  (Tr. at 63:13-64:2)  This testimony is consistent with a detailed declaration that Caruso submitted in connection with the pending motion. (See Decl. of Joseph Caruso ("Carso Decl.") ¶ 16-18, ECF No. 64-6.) Caruso additionally reviewed a series of e-mails between Vitale and Deninno in December 2015 concerning certain travel documents.  (Tr. at 74:12-76:12.)  Those e-mails were provided to the Court as Defense Exhibits 11-16, and were accepted into evidence.  As Caruso correctly noted during direct examination, the e-mails indicate that on December 14, 2015, Vitale asked Deninno to "modify" a .PDF version of a flight itinerary and that Deninno did in fact modify the document and send a changed version to Vitale the same day.  (Id.)

3.    Deninno

As previously noted, Deninno is the President and CEO of ComLab.  (Tr. at 97:13.)  In that role, Deninno is personally responsible for generating and sending

invoices for work that ComLab performs, including the work it purportedly performed for Kal Tire. (Tr. at 97:17-22.) Compared to the Kal Tire witnesses, the Court found Deninno to be unprepared and inconsistent. The Court ultimately found Deninno to be an unreliable witness, and does not credit his testimony in resolving the pending motion.

Deninno testified under oath that he had a general practice of sending a monthly e-mail attaching an invoice on ComLab projects, and that he sent each of the Subject E-mails in this action. (Tr. at 98:10-13, 104:17-24.) Because Vitale left Kal Tire at the end of March 2016, certain of the Subject E-mails were sent only to Brothen. (Tr. at 105:2-5.)

At the outset of litigation with Kal Tire, Deninno's counsel instructed him to "collect everything" he had regarding the alleged contract and services provided. (Tr. at 108:11-15.) As a result, in approximately October 2016, Deninno compiled relevant documents—including e-mails—into a "Dropbox" folder on his computer and shared that folder with his counsel. (Tr. at 108:18-109:6.) Importantly, Deninno only saved .PDF versions of e-mails to his computer, not the "native" versions. (Tr. at 109:1-4.) Deninno testified that he believed that by saving all relevant documents to his hard drive, including e-mails in .PDF format, he was adequately preserving those documents for purposes of litigation. (Tr. at 109:13-16.) The Court did not find this explanation credible.

In November 2017, Deninno received a request for production of documents from Kal Tire. (Tr. at 109:17-21.) Because the document included legal language,

Deninno testified that he did "[n]ot really" read it, instead choosing to let his counsel deal with it. (Tr. at 109:22-110:1.) The Court did not credit this testimony, as he otherwise demonstrated familiarity with the document's contents. At some point after November 2017, Deninno claims that he realized something was wrong with his computer; in particular, it was slower than usual. (Tr. at 110:10-24.) In response, Deninno initially tried troubleshooting the issue, but ultimately decided to delete all e-mails created prior to December 31, 2017 from his server in an attempt to remedy the problem. (Tr. at 111:3-112:19.) The Court found Deninno's testimony on this issue plainly not credible.

In May 2018, Deninno became aware that there was a "major problem" related to his deletion of prior e-mails. (Tr. at 119:22-120:7.) In response, Deninno contacted GoDaddy support in a purported effort to retrieve the deleted e-mails, so that they could be produced in response to Kal Tire's document request. (113:5-9_) On cross-examination, Deninno testified that he waited until May 2018 to contact GoDaddy—even though he was aware that Kal Tire had requested native documents as early as November 2017—because his counsel did not specifically ask him for native files until April 2018. (Tr. at 120:1-25.) Deninno further conceded that neither he nor ComLab ever issued a "litigation hold" after this action was commenced. (Tr. at 125:1-8.)

## II. LEGAL PRINCIPLES

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably

foreseeable litigation." West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999). "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation. Once a court has concluded that a party was under an obligation to preserve the evidence that it destroyed, it must then consider whether the evidence was intentionally destroyed, and the likely contents of that evidence." Fujitsu Ltd. v. Fed. Exp. Corp., 247 F.3d 423, 436 (2d Cir. 2001) (citing Kronisch v. United States, 150 F.3d 112, 126-27 (2d Cir. 1998)).

It is well-established that a district court may impose sanctions for spoliation under Fed. R. Civ. 37(b), or, even in absence of a court order, pursuant to its inherent power to control litigation. See Chambers v. NASCO, Inc., 501 U.S. 32, 43-45 (1991); see also West, 167 F.3d at 779. A district court has broad discretion in crafting a proper sanction for spoliation "molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." West, 167 F.3d at 779 (citing Kronisch, 150 F.3d at 126); see also Fujitsu, 247 F.3d at 436 (holding that "[t]he determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge"). The Second Circuit has held that the sanction should be designed to "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." West, 167 F.3d at 779 (internal quotations omitted).

"[O]utright dismissal of a lawsuit . . . is within the court's discretion."
Chambers, 501 U.S. at 45. Dismissal has been deemed appropriate "if there is a
showing of willfulness, bad faith, or fault on the part of the sanctioned party."
West, 167 F.3d at 779 (citing Jones v. NFTA, 836 F.2d 731, 734 (2d Cir. 1987)); see
also Metro Foundation Contractors, Inc. v. Arch Ins. Co., 551 Fed. Appx. 607, 610
(2d Cir. 2014) (affirming sanction of dismissal where spoliation was intentional and
evidence was "central to [the defendant's] ability to challenge [plaintiff's] claims").
That said, because dismissal is a "drastic remedy," it "should be imposed only in
extreme circumstances, usually after consideration of alternative, less drastic
sanctions." West, 167 F.3d at 779-780 (quoting John B. Hull, Inc. v. Waterbury
Petroleum Prods., Inc., 845 F.2d 1172, 1176 (2d Cir. 1988)).

The party seeking discovery sanctions based on spoliation bears the burden of
proving that spoliation in fact occurred by a preponderance of the evidence. See
Klipsch Grp., Inc. v. ePRO E-Commerce Ltd., 880 F.3d 620, 628 (2d Cir. 2018). The
burden of proof for a claim of fabrication, which effectively amounts to a fraud on
the court, is "clear and convincing evidence." Passlogix, Inc. v. 2FA Tech., LLC, 708
F. Supp. 2d 378, 406 (S.D.N.Y. 2010).

III.    DISCUSSION

Having carefully reviewed the parties' respective written submissions as well
as the evidence introduced during the hearing on July 18, 2018, the Court concludes
by clear and convincing evidence that ComLab fabricated the Subject E-mails and
subsequently spoliated evidence in order to hide that fact. Due to the serious

nature of this transgression as well as the critical nature of the fabricated evidence to ComLab's breach of contract case, the Court concludes that this action must be dismissed as a result.

The Court found Allan Heel's testimony to be extremely persuasive. In his role as Director of Platform and Productivity Technology Information Services, Heel was in a position to know whether any modifications were made to the MyMTG intranet during the period of the alleged contract. Heel testified credibly that no such modifications were made, which directly contradicts ComLab's assertion that it provided services under the contract at least at the outset of the agreement. Heel further testified credibly that ComLab <u>never received</u> any of the Contested Invoices or Subject E-mails—he searched Vitale and Brothen's e-mail accounts, both of which had a "litigation hold" enabled, and was unable to locate any of the documents at issue. Critically, Heel testified credibly that Vitale and Brothen would have been unable to delete the contested documents in a manner that would escape Kal Tire's litigation hold; if the documents ever existed on Kal Tire's servers, he would have been able to find them.

Heel's testimony alone is sufficient to raise serious doubts about the authenticity of the Subject E-mails, but Deninno's overall lack of credibility and inability to produce a <u>shred</u> of corroborative, objective evidence leaves no question in the Court's mind that the contested documents were fabricated. Deninno claims to have detected a virus on his computer in November 2017. But if Deninno's story is to be believed, he displayed a shocking amount of incompetence in attempting to

mitigate that virus. As an IT professional, he should have recognized that arbitrarily separating and deleting e-mails by date while retaining other non-executable documents would not fix the problem. For these reasons, the Court does not credit Deninno's testimony. Instead, the evidence clearly shows that, after delaying production of this critical evidence for months, Deninno willfully deleted the native e-mails in a deliberate attempt to hide the fact that they were fabricated.

Kal Tire's expert Joseph Caruso, on the other hand, was highly credible. The Court was persuaded by his testimony that the metadata contained in the invoices attached to the Subject E-mails was likely manipulated since the "Last modified" date and time post-dated the "Date last saved" in several instances. Further, Caruso clearly demonstrated that Deninno and Vitale had communicated about and in fact manipulated other documents during Vitale's time at Kal Tire, including the travel documents introduced during the evidentiary hearing. Combined with Heel's credible testimony that the Subject E-mails were not received and no services were provided and Deninno's implausible story, evidence of contemporaneous fabrications is damning.

This is ultimately not a hard decision, so the Court will not belabor the issue. Multiple people at Kal Tire, including Heel, Brothen,[4] and even Vitale[5] testified that Kal Tire never received the Subject E-mails. Those employees were in the best position to know and/or ascertain whether the Subject E-mails were received, and

---

[4] Following the hearing at which Heel testified, Brothen submitted a declaration affirming that she "never received" the Subject Emails. (Brothen Decl., ECF No. 72.)

[5] During his deposition, Vitale answered "No, I don't recall" in response to a question of whether he received any ComLab invoices after November 2015. (See ECF No. 73.)

their testimony is extremely credible, particularly in light of the fact that no MyMTG services were actually rendered. On the other hand, Deninno lacks credibility. His story regarding a computer virus does not make sense, nor does his purported response to that virus, which conveniently resulted in him deleting the native e-mail files after they were requested. Ultimately, it is unsurprising that Deninno and ComLab have been unable to produce a single piece of objective evidence corroborating the virus story; it simply isn't true. Although the Court need only find spoliation by a preponderance of the evidence, it easily concludes that Deninno fabricated and subsequently spoliated critical documents by "clear and convincing evidence."

With regards to sanctions, the Court has considered the full complement of options available to it under the applicable rules and its inherent authority. It warrants repeating that this is a serious transgression. ComLab not only intentionally fabricated critical evidence, thereby perpetuating a fraud on the Court, it subsequently spoliated evidence that was critical to Kal Tires defense in this case—let alone the Court's ability to easily determine whether fabrication occurred. See Metro Foundation Contractors, Inc. v. Arch Ins. Co., 551 Fed. Appx. 607, 610 (2d Cir. 2014) (affirming dismissal where spoliation concerned documents highly relevant to opposing party's defenses). Indeed, in its efforts to defend against this litigation, Kal Tire has consistently disputed the authenticity of the Contested Invoices, and demanded—since at least January 2017—native versions of the Subject Emails that would allow Kal Tire's experts to assess their veracity. By

permanently deleting native versions of the disputed documents, ComLab has deprived Kal Tire of its core defense and irreversibly prejudiced its ability to defend this litigation.  See id.

ComLab's actions not only prejudiced Kal Tire, which has no doubt expended significant resources in defending this litigation, but also the Court, which has now been forced to spend significant time presiding over this absurd series of events. Having considered lesser sanctions such as a fine, an adverse jury instruction, and other less drastic sanctions, the Court concludes that dismissal is the only appropriate sanction here.  ComLab has acted willfully and in bad faith, and deprived Kal Tire of a meaningful opportunity to defend this lawsuit.  Because of the seriousness of ComLab's transgression, and the significance of the emails to this litigation, only dismissal will adequately deter ComLab while restoring Kal Tire to the position it would be in but for ComLab's conduct.  See West, 167 F.3d at 779.

IV.    CONCLUSION

For the reasons stated above, the Court hereby GRANTS Kal Tire's motion for sanctions as requested.  As a result, this action is hereby DISMISSED with prejudice, and ComLab shall pay Kal Tire's reasonable attorney's fees and costs incurred in defending this action.

The Clerk of Court is directed to close all open motions, enter judgment in accordance with this Opinion & Order, and terminate this action.

SO ORDERED.

Dated:      New York, New York
            September 11, 2018

_____
KATHERINE B. FORREST
United States District Judge